E-FILED
Thursday, 05 February, 2026 02:19:16 PM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

JOSHUA POE,
      Plaintiff,

v.                                                   Case No. 4:24-cv-04084-JEH

KURT OSMUNDSON, *et al.*,
      Defendants.

**Order**

This matter is now before the Court on Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1(D). (Doc. 36). For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED.

**I**

Plaintiff, proceeding *pro se*, filed an Amended Complaint under 42 U.S.C. § 1983 alleging Defendants Osmundson, Kramer, and Shinn violated his constitutional rights while he was incarcerated at Hill Correctional Center ("Hill"). (Docs. 8, 9). First, Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Specifically, Plaintiff alleges he was unable to wake up to receive his morning dose of seizure medication during medication pass from 3:00-4:00 a.m. because his evening medication, Remeron, put him in a deep sleep. Plaintiff alleges he informed Defendants Osmundson, Kramer, and Shinn about these issues, but they refused to change the distribution time or prescription. As a result, Plaintiff claims he suffered seizures. Second, Plaintiff alleges Defendant Osmundson violated his First Amendment rights by retaliating against him for filing a grievance.

Defendants filed a Motion for Summary Judgment (Doc. 36); Plaintiff filed a Response (Doc. 43); and Defendants filed a Reply (Doc. 50).

## II

The Court finds the following material facts. During the relevant period, Plaintiff was an inmate in the custody of the Illinois Department of Corrections ("IDOC") and incarcerated at Hill.

Defendant Dr. Kurt Osmundson was employed by Wexford Health Sources, Inc. ("Wexford") as the Medical Director at Hill and provided medical care to inmates. (Doc. 36-1 at ¶¶ 2-3). Defendants Kasey Kramer and Samantha Shinn were employed by Wexford as nurse practitioners and provided medical care to inmates at Hill. (Doc. 36-2 at ¶¶ 2, 4; Doc. 36-3 at ¶¶ 2, 4).

Based on Defendant Osmundson's education, training, and experience as a physician, he is familiar with treating patients who present with seizures, as well as the standard of care. (Doc. 36-1 at ¶ 6). Defendants Osmundson, Kramer, and Shinn did not review or have access to Plaintiff's mental health records unless a mental health provider sent a note for them to review any records or specific mental health notes were brought to their attention. As a result, if Plaintiff had complained to mental health staff about any ailments or issues with medications, Defendants would not have been made aware of those complaints. (Doc. 36-1 at ¶ 14; Doc. 36-2 at ¶¶ 14-15; Doc. 36-3 at ¶¶ 14-15).

Defendants Osmundson, Kramer, and Shinn were not responsible for filling medications from the pharmacy and dispensing them to individuals in custody. Doc. 36-1 at ¶ 15; Doc. 36-2 at ¶ 16; Doc. 36-3 at ¶ 16). Medical staff, including the Medical Director, do not have authority to change the time that medication is distributed by medication line ("med-line") nurses. (Doc. 36-1 at ¶ 23; Doc. 36-2 at ¶ 21; Doc. 36-3 at ¶ 21). Medication distribution is an IDOC institutional policy regarding scheduled movement inside the facility and is used as a security

2

measure. (Doc. 36-1 at ¶ 16). Nurses distribute medication to inmates during med-line at scheduled times determined by security staff at Hill. The distribution of medication to an individual is monitored using a Medication Administration Record ("MAR"). *Id*. at ¶ 17. The MAR is marked by the med-line nurse to show the outcome of the medication distribution. According to the MAR's Instructions and Non-Administered Medication Reason Codes, a nurse's initials are used to indicate the medication was given to the individual. If the spot is circled with a nurse's initials, a number 1 or both, this code indicates that the individual refused the dose of medication. *Id*. at ¶ 18. In Defendant Osmundson's practice, he would not look at the MARS documents unless there was an appointment made specifically to address medication issues or if another provider or nurse brought such issue to his attention. If another provider or nurse asked Defendant Osmundson to review the MARS documents, such a request would be noted on the patient's progress notes. *Id*. at ¶ 25.

On April 30, 2021, Plaintiff first reported a seizure while he was incarcerated at Western Illinois Correctional Center ("Western"). Plaintiff told an LPN he had a seizure in his cell a few months prior. The nurse noted there was no documentation that Plaintiff had a history of seizures. *Id*. at ¶ 27. Plaintiff self-reported another seizure to nursing staff at Western on June 4, 2021, stating that he had a seizure "on the 27th" and that he was not currently taking any seizure medication. *Id*. at ¶ 28. On July 29, 2021, following another self-reported seizure, Plaintiff was prescribed Dilantin. *Id*. at ¶ 29. Between January and July 2022, Plaintiff self-reported additional seizures. *Id*. at ¶ 30.

While at Western, Plaintiff refused to take the prescribed Dilantin due to it being prescribed as "open to float," claiming it caused him eye pain. *Id*. at ¶ 31. When medication is prescribed "open to float," the medication is crushed and put

into a liquid, which the patient drinks in the presence of medical staff. *Id*. at ¶ 32. At Western, Plaintiff was allowed to keep Dilantin on his person. *Id*. at ¶ 33.

On or about January 5, 2022, Plaintiff was prescribed Remeron. *Id*. at ¶ 34. On or about March 30, 2022, Plaintiff was prescribed Lamictal by a mental health provider. *Id*. at ¶ 35.

Plaintiff arrived at Hill on August 30, 2022. Upon his arrival, Plaintiff refused to have his labs drawn for CBC, LFT, and Dilantin levels. *Id*. at ¶ 37. Plaintiff was seen by a nurse at the clinic on August 31, 2022, at which time it was noted Plaintiff had a seizure disorder. The nurse educated Plaintiff about the importance of oral hygiene and medical compliance. *Id*. at ¶ 38.

On or about September 9, 2022, Plaintiff was provided with Dilantin to keep on his person because he had not yet seen a physician at Hill. Thus, the medication was provided pursuant to the current prescription from Western. *Id*. at ¶ 39. When medical staff at Hill renewed Plaintiff's prescription on October 12, 2022, Plaintiff was no longer allowed to keep Dilantin on his person. *Id*. at ¶ 40.

Defendant Osmundson saw Plaintiff for the first time on November 7, 2022, to address his complaints regarding wrist and elbow pain. He noted Plaintiff was awake, alert, and oriented and not in apparent distress. Defendant Osmundson referred Plaintiff to an orthopedic specialist and ordered Plaintiff to take Naproxen 500 mg twice a day. *Id*. at ¶ 42.

Plaintiff saw Dr. Ilyas on November 22, 2022, at which time his prescription of Lamictal was increased to 200 mg at night, and he started taking Abilify. *Id*. at ¶ 43.

Plaintiff refused labs on October 5, 2022, and December 7, 2022. *Id*. at ¶¶ 41, 44. Plaintiff missed his morning dose of Dilantin on December 31, 2022. *Id*. at ¶ 48. There were no notes indicating Plaintiff took Remeron or his evening dose of Dilantin on December 30 and 31, 2022. *Id*. at ¶ 49.

4

On January 11, 2023, Defendant Kramer first saw Plaintiff for a medical furlough follow-up of his orthopedic appointment. Plaintiff complained Dilantin caused gum swelling. Defendant Kramer noted Plaintiff was alert, oriented, not in apparent distress, and had gum tissue edema. Defendant Kramer discontinued Dilantin and prescribed 500 mg of Keppra to be taken twice a day under direct observation therapy. (Doc. 36-2 at ¶¶ 24, 26). Defendant Kramer's treatment practices included following the manufacturer's guidelines as to medication administration, as this practice is common in the medical profession and within the standard of care. *Id.* at ¶ 22. Plaintiff received his morning dose of Dilantin from January 1-11, 2023, at which time the medication was changed to Keppra. (Doc. 36-1 at ¶ 50).

Defendant Osmundson next saw Plaintiff on February 22, 2023, to follow up on the secondary burn to his left arm. He educated Plaintiff on the importance of keeping the burn open to air, continuing to shower, and coming to the Health Care Unit ("HCU") for small dressing changes for seven days. Defendant Osmundson noted Plaintiff should be scheduled for a follow-up with a doctor in 10- 14 days. *Id*. at ¶ 54.

On February 26, 2023, Plaintiff was seen at the HCU after he reported falling when he was climbing into his bunk. Due to the fall, he twisted his left ankle and hit his left hip. Plaintiff was prescribed Tylenol and Ibuprofen and told to return if symptoms worsened or interfered with daily functioning. *Id*. at ¶ 55.

On March 1, 2023, a nurse examined Plaintiff's burn, noted the burn was healing and there were no signs of infection, educated Plaintiff about caring for his burn, and provided him with Ibuprofen. *Id*. at ¶ 56.

Defendant Shinn first encountered Plaintiff on March 1, 2023, to assess the burn on his left arm. (Doc. 36-3 at ¶ 24). As part of her assessment, Defendant Shinn asked Plaintiff if he was taking any medications, to which he responded he

was taking psych meds. Plaintiff did not make any further comments regarding his medication to Defendant Shinn during this visit. *Id*. at ¶ 25.

On March 2, 2023, Plaintiff saw RN Sell for an MRI. (Doc. 36-1 at ¶ 57). On March 8, 2023, Defendant Kramer saw Plaintiff for a follow-up visit regarding the MRI of his left knee. (Doc. 36-2 at ¶ 27). Plaintiff complained about knee and ankle pain from twisting his ankle. *Id.* at ¶ 28. Defendant Kramer referred Plaintiff back to Dr. Wilson for his left knee and left wrist, provided an ace wrap for his left ankle, and ordered him to continue taking Ibuprofen. *Id.* at ¶ 29. According to Defendant Kramer, Plaintiff did not raise any medication issues during this visit. *Id.* at ¶ 30. Plaintiff disputes this assertion and claims he informed Defendant Kramer about the issues he was having taking his morning dose of Keppra.

On March 9, 2023, Defendant Osmundson made a note in Plaintiff's medical records that Plaintiff was going to see Dr. Wilson, an orthopedic specialist, about his left wrist. (Doc. 36-1 at ¶ 59).

On March 14, 2023, Nurse Sten noted that Plaintiff was called twice to come to the HCU, but he refused to come and refused his morning labs. *Id.* at ¶ 60. Plaintiff refused labs again on March 20, 2023. *Id.* at ¶ 61.

Dr. Ilyas saw Plaintiff on March 21, 2023 and noted Plaintiff reported that he wakes up with nightmares but is able to fall back asleep after a few minutes. Plaintiff also requested an increase in his dosage of Abilify. *Id.* at ¶ 62.

Plaintiff was seen by a licensed practical nurse ("LPN") on March 25, 2023 for left knee pain and right foot pain. Plaintiff stated he had hurt his knee on March 20, 2023 while getting off the top bunk and hurt his foot that same day when officers had mistakenly shut the door on his foot. Plaintiff was provided with Ibuprofen and taught about how to care for his injuries. *Id.* at ¶ 63.

In March 2023, Plaintiff refused his morning dose of Keppra on March 1, 3, 4-7, 9, 10, 13, 16, 17, 21-25, and 28-31. *Id*. at ¶ 64. Plaintiff did not miss any evening Remeron dosages in March 2023. *Id*. at ¶ 65.

On April 4, 2023, Plaintiff was seen by an LPN regarding his right foot and left wrist, knee, and ankle pain. The LPN noted Plaintiff was waiting for an appointment with Dr. Wilson and was taking Ibuprofen. *Id*. at ¶ 66. On April 26, 2023, Nurse Stone saw Plaintiff regarding his right foot and left knee and ankle pain. Plaintiff asked Nurse Stoen if he could keep Keppra on his person so that he could take his morning dosage due to taking Remeron at night. *Id*. at ¶ 67. Defendant Osmundson contends he was not made aware of the nurse's notes, nor was he informed of what information a patient shares with health care staff. *Id*. at ¶ 68.

In April 2023, Plaintiff was noted to have missed or refused his morning dose of Keppra on April 1, 4-11, 13-17, 19-25, and 27-30. *Id*. at ¶ 70. Plaintiff was noted to have been a no show for his evening Keppra and Remeron medications on April 4, 2023. *Id*. at ¶ 71.

On May 1, 2023, Defendant Osmundson saw Plaintiff for a furlough follow-up visit following his April 27, 2023 appointment with the orthopedic specialist for his left knee and wrist. Plaintiff was alert, oriented, and not in apparent distress. Defendant Osmundson noted Plaintiff had De Quervain's condition in his left wrist, a condition which affects tendons on the thumb-side of the wrist, and that Plaintiff's MRI of his left knee was positive. Defendant Osmundson referred Plaintiff to Dr. Below for his left knee and noted Plaintiff's MRI would be sent to Dr. Below's office prior to the appointment. *Id*. at ¶ 72. According to Defendant Osmundson, Plaintiff did not raise any issues regarding medication during this appointment. *Id*. at ¶ 73.

In May 2023, Plaintiff attended appointments to address his left knee, left ankle, and right foot pain. *Id.* at ¶¶ 74-77.

On May 29, 2023, Plaintiff was seen by a nurse in the HCU and reported that he had a seizure on May 26, 2023 and injured his right thumb. The nurse documented his right thumb was bruised and swollen. Plaintiff could move the thumb but could not bend it. Plaintiff was provided with a cold pack as needed for 24 hours. *Id.* at ¶ 78.

Plaintiff saw Dr. Ilyas on May 31, 2023. Plaintiff told Dr. Ilyas he could not wake up at 3:00 a.m. to go to the HCU to take his Keppra for a few days and then had a seizure. Plaintiff stated he wakes up with nightmares but can fall back asleep after a few minutes. *Id.* at ¶ 79. Defendant Osmundson was not made aware of Plaintiff's complaint regarding his medication on May 31, 2023. *Id.* at ¶ 80.

In May 2023, Plaintiff missed or refused to take his morning Keppra medication on May 3, 10, 11, 14, 15, 17, 18, 21-24, and 26. *Id.* at ¶ 81. Plaintiff was noted to have missed or refused his evening Remeron and Keppra on May 13 and 14. *Id.* at ¶ 82.

Around 3:15 p.m. on June 5, 2023, Plaintiff was seen by an LPN regarding his self-reported, brief seizure which occurred around 2:15 p.m. that day. Plaintiff was noted to be compliant with his seizure medication. The nurse noted that Plaintiff had a small bump on the back of his head, but no open wounds. *Id.* at ¶ 83.

Plaintiff was seen by a nurse again on June 6, 2023 for his left knee, left ankle, and right thumb pain. Plaintiff was instructed to keep his thumb elevated as much as possible with an easy range of motion. *Id.* at ¶ 84. On June 12, 2023, Plaintiff was seen by LPN Whit for left knee, left ankle, right thumb, right foot, and head pain – injuries he claimed occurred because of or after seizures. Plaintiff's right thumb was noted to be swollen. The nurse noted that Plaintiff was referred to ortho on

June 15, 2023. *Id*. at ¶ 85. Plaintiff refused his morning labs on June 15, 2023. *Id*. at ¶ 86. On June 19, 2023, Plaintiff returned from medical furlough and was scheduled for a follow-up with Defendant Osmundson on June 21, 2023. *Id*. at ¶ 87. Plaintiff refused to attend his medical furlough follow-up visit on June 21, 2023. *Id*. at ¶ 88.

An onsite x-ray of Plaintiff's right thumb and left ankle was completed on June 26, 2023. *Id*. at ¶ 89. Dr. Meyermann reviewed the x-rays on June 26, 2023, noting the "metacarpophalangeal, proximal, and distal interphalangeal joints," that there was no fracture or dislocation, and that there was no appreciable soft tissue swelling. He concluded that Plaintiff's thumb was normal. *Id*. at ¶ 90.

Plaintiff did not attend his appointment with Dr. Ilyas on June 27, 2023. *Id*. at ¶ 91.

Plaintiff saw Nurse Boley on June 30, 2023, noting that his head was tender to touch where he hit in on cement when he passed out, but he was not having any headaches. Plaintiff was provided with Ibuprofen. *Id*. at ¶ 92.

In June 2023, Plaintiff is noted to have refused or missed his evening Remeron every day except for June 1, 3, 4, 6, 11, and 25. *Id*. at ¶ 93. Plaintiff refused or missed his morning dose of Keppra on June 1-9, 16, 17, 21, and 22. *Id*. at ¶ 94. Plaintiff refused or missed his evening dose of Keppra on June 2 and 27, 2023. *Id*. at ¶ 95.

Defendant Shinn saw Plaintiff on July 5, 2023 for a medical furlough orthopedic follow-up visit. During this visit, Plaintiff indicated he had not yet received his wrist brace and asked about the status of an x-ray on his right thumb and left ankle. (Doc. 36-3 at ¶ 26).

On July 14, 2023, Plaintiff saw an LPN for about his headache, which he claimed was caused by the seizure he experienced on June 5, 2023. Plaintiff was

provided with an ice pass and referred to Defendant Shinn on July 18, 2023. (Doc. 36-1 at ¶ 97).

Plaintiff saw Dr. Ilyas on July 26, 2023. Plaintiff reported he was easily irritated and had bad mood swings. He also stated could not sleep without Remeron, but he was having issues waking up on time to take his Keppra when he took Remeron. He reported that he had two seizures when he stopped taking his morning Keppra and was refusing to take Remeron. *Id.* at ¶ 98.

On July 27, 2023, Plaintiff refused his morning labs. Id. at ¶ 99. On July 30, 2023, Plaintiff refused to go to nurse sick call. *Id.* at ¶ 100.

On July 31, 2023, a nurse noted on Plaintiff's progress notes that Dr. Ilyas had requested whether it was possible to change Plaintiff's Keppra dosage to 1000 mg once a day instead of 500 mg twice a day. The nurse noted that the chart would be given to MD to review. *Id.* at ¶ 101. Defendant Osmundson reviewed Dr. Iylas's request and Plaintiff's chart on July 31, 2023, and made a note in his progress notes to see the physician's order sheet prescribing Plaintiff 1000 mg of Keppra to be taken once a day in the evening. *Id.* at ¶ 102.

According to Defendant Osmundson, due to the half-life of Keppra, it is best practice to have the medication taken twice a day, once in the morning and once in the evening. Therefore, the original Keppra prescription of 500 mg twice a day was the ideal prescription for maximum effectiveness. *Id.* at ¶ 103. However, Defendant Osmundson agreed to prescribe Plaintiff 1000 mg of Keppra once a day due to Dr. Ilyas's request, with the understanding that Plaintiff would be monitored to see if this new dosage effectively controlled his seizures. *Id.* at ¶ 105. The note from Dr. Ilyas on July 31, 2023 was the only note and request Defendant Osmundson received from Dr. Ilyas or any other mental health provider regarding Plaintiff's Keppra medication. *Id.* at ¶ 106.

In July 2023, Plaintiff refused his evening Remeron medication every day except for July 3, 4, 8, 9, 14, 17, and 31. *Id*. at ¶ 107. Plaintiff did not miss any morning or evening Keppra doses in July 2023. *Id*. at ¶ 108.

On August 1, 2023, Defendant Shinn saw Plaintiff at the clinic for an annual visit. Defendant Shinn noted Plaintiff had a seizure diagnosis and reported that he takes Remeron at night, making it hard to wake up and take his morning dosage of Keppra. (Doc. 36-3 at ¶ 27). Defendant Shinn noted, however, that as of August 1, 2023, Plaintiff's Keppra prescription was already 1000 mg once a day. *Id*. at ¶ 28. Defendant Shinn therefore classified Plaintiff's seizure outcome as good and his condition as stable as of the August 1, 2023 visit. *Id*. at ¶ 29.

On August 2, 2023, Defendants Shinn and Kramer were made aware of a grievance Plaintiff filed against Defendant Osmundson about the issues he was having waking up to take his seizure medication between 3:00-4:00 a.m. (Doc. 36-2 at ¶ 31; Doc. 36-3 at ¶ 30). Defendant Shinn noted Plaintiff's Keppra prescription had been changed to once a day, but she was still concerned about his reported level of sedation from Remeron and referred him to a mental health professional to address that concern. (Doc. 36-3 at ¶ 30). Defendant Kramer was aware Defendant Shinn had referred Plaintiff to a mental health provider and that Defendant Osmundson had already modified Plaintiff's Keppra prescription. Defendant Kramer did not take any additional action. (Doc. 36-2 at ¶¶ 32, 33).

On August 2, 2023, Plaintiff was seen for his right thumb, left ankle, and the back of his head. Plaintiff requested an MRI. The nurse informed Plaintiff to return to sick call if his pain increased, he experienced numbness, or his skin changed colors. (Doc. 36-1 at ¶ 109). Plaintiff was seen again on August 5, 2023 by an LPN who noted that there was no change in assessment for his ankle, head, and thumb pain. *Id*. at ¶ 110.

11

Plaintiff was seen for his ankle, thumb, and head on August 12, 2023 by LPN Newman and was scheduled to see a nurse practitioner on August 16, 2023. *Id.* at ¶ 111.

Plaintiff refused to attend his appointment with Dr. Ilyas on August 14, 2023. *Id.* at ¶ 112. Plaintiff refused to come to the HCU for labs and August 24 and September 5 and 7, 2023. *Id.* at ¶¶ 113-114.

Defendant Osmundson's next visits with Plaintiff occurred on September 13 and 20, 2023, to address Plaintiff's complaints of diarrhea. *Id.* at ¶ 115.

Dr. Ilyas saw Plaintiff on September 25, 2023, at which time Plaintiff was in restrictive housing and under investigation. *Id.* at ¶ 116.

A nurse saw Plaintiff on October 11, 2023 for right thumb pain. The nurse discussed this visit with Defendant Osmundson and noted that Plaintiff would have a follow-up visit with ortho. *Id.* at ¶ 117.

According to the MAR document, Plaintiff is noted to have taken his Keppra medication in the morning instead of the evening on October 14, 2023. *Id.* at ¶ 118. There is no note that Plaintiff took any of his medications on October 15, 2023. *Id.* at ¶ 119.

At approximately 9:30 p.m. on October 16, 2023, Plaintiff saw a nurse and self-reported that he had a seizure while going to the bathroom. There were no open wounds noted. *Id.* at ¶ 120. On October 27, 2023, Plaintiff saw a nurse for complaints of facial discomfort since his "falling out" on October 16, 2023. Plaintiff was provided with Ibuprofen. *Id.* at ¶ 121.

During his visit with Dr. Ilyas on November 6, 2023, Plaintiff stated he passed out twice and hit his head, but security did not allow him to go to the HCU. *Id.* at ¶ 122.

On November 8, 2023, Plaintiff reported to Nurse Boley that the back of his head was still tender since he hit it during his seizure in May. Plaintiff was provided with Tylenol. *Id*. at ¶ 123.

Plaintiff refused labs on November 14 and 16, 2023. *Id*. at ¶ 124. On November 21, 2023, Plaintiff refused to attend nurse sick call. *Id*. at ¶ 125.

Plaintiff was seen by an LPN on November 25, 2023 for his left ankle, right thumb, lower back, and face pain. The nurse noted Plaintiff had a prescription for Voltaren which had not been refilled since June 23, 2023, so she refilled the prescription. *Id*. at ¶ 126.

On December 14, 2023, Dr. Wilson saw Plaintiff regarding his left wrist right hand pain. Plaintiff told Dr. Wilson he had a seizure and fell out of bed, injuring his right thumb. Dr. Wilson noted that there were no signs of fracture, dislocation, or acute osseous abnormality. *Id*. at ¶ 129. Dr. Wilson recommended a waist chain permit and a follow-up in three months. *Id*. at ¶ 130. On December 15, 2023, Defendant Osmundson prescribed Plaintiff a waist chain and low bunk permit for one year. *Id*. at ¶ 131.

Plaintiff refused labs on December 15, 2023. *Id*. at ¶ 132.

On or about February 16, 2024, Defendant Kramer signed off on Plaintiff's labs and x-rays, noting that the metabolic panel was normal except for a slightly elevated glucose level. (Doc. 36-2 at ¶ 34).

On or about July 4, 2024 through July 5, 2024, Plaintiff was put on a 23-hour infirmary admission for a reported seizure. (Doc. 36-2 at ¶ 134). This was the first time that Plaintiff had been admitted for a seizure while at Hill. *Id*. at ¶ 135. If an inmate has a seizure that is either witnessed or documented by staff, the inmate is placed in the infirmary for 23 hours of observation. Upon being evaluated the next day, if the inmate has not experienced any further seizures, the inmate is discharged to the housing unit. *Id*. at ¶ 133.

13

Defendant Osmundson saw Plaintiff on July 5, 2024, at which time Plaintiff denied seizures and indicated he had no complaints. Plaintiff appeared alert and oriented, was not in acute distress, and did not have a focal deficit. Defendant Osmundson discontinued Plaintiff's 23-hour observation. *Id*. at ¶ 136.

On July 17, 2024, an LPN noted Plaintiff came to the HCU because he had not received his morning medication. Plaintiff was informed he was not currently on any morning medication. (Doc. 36-2 at ¶ 35). Defendant Kramer then saw Plaintiff on July 17, 2024, at which time he indicated that he had been having seizures due to not taking a morning dosage of Keppra. Plaintiff reported he had suffered a "big one" on July 4, 2024, but pursuant to nursing notes, Plaintiff did not experience a postictal period. *Id*. at ¶ 36. A postictal period is the phrase used to describe the temporary symptoms typically experienced by an individual immediately following a seizure, including but not limited to, exhaustion, confusion, and sore muscles. *Id*. at ¶ 37. Plaintiff requested to take Keppra twice a day. Defendant Kramer instructed Plaintiff that he is expected to be compliant and show up to medline twice a day to take his medication. Defendant Kramer then changed his Keppra prescription back to 500 mg twice a day. *Id*. at ¶ 38. Defendant Kramer states she was comfortable changing Plaintiff's Keppra prescription since she was changing the medication back to the manufacturer's recommendation for administration. *Id*. at ¶ 39.

According to Defendant Osmundson, he is not made aware of grievances filed against him and does not make medical or treatment decisions based on whether a patient tells him they have filed a grievance against him. (Doc. 36-1 at ¶¶ 137-138).

## III

## A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## B

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). Deliberate indifference involves a two-part analysis; the plaintiff must show that (1) the medical condition was objectively serious, and (2) the prison official acted with deliberate indifference to his medical needs. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021).

An objectively serious injury or medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765-66 (7th Cir. 2002) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997)). Indications of a serious medical need can include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1373.

To establish the subjective element of a deliberate indifference claim, the plaintiff must show that the prison official acted with a sufficiently culpable state of mind. *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). "[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "This is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). "[M]ere negligence" or even civil "objective recklessness" simply "is not enough." *Petties*, 836 F.3d at 728. "This subjective standard requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 837) (internal citations omitted).

"Within the universe of deliberate indifference cases is a narrower category where a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition." *Lockett v. Bonson*,

937 F.3d 1016, 1023 (7th Cir. 2019). "[T]hese cases are better framed 'not [as] deliberate indifference to a serious medical need,' but as a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'" *Id.* (citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). In such cases, courts defer to a medical professional's treatment decisions "unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). A disagreement between the prisoner and his medical provider "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

## C

A prison official who acts in retaliation for a prisoner's exercise of a constitutional right violates the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). A prison official may not retaliate against a prisoner for filing a grievance. *Id.* (citing *Babcock v. White*, 102 F.3d 267, 274-75 (7th Cir. 1996)).

The burden of proof in a First Amendment retaliation claim "is split between the parties." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). A plaintiff must first demonstrate a *prima facie* case of retaliation by establishing: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014).

"Once a prima facie case is established, the burden shifts to the defendant to rebut the claim." *Manuel,* 966 F.3d at 680. Defendants must demonstrate they would have taken the same action regardless of the protected activity. *Id*.; *see also Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). "If the defendants meet this

17

burden, then the plaintiff must show that the defendants' proffered reason was pretextual—in other words, a lie—and that the real reason was retaliatory animus." *Lindell v. Kind,* No. 19-C-702, 2021 WL 6137381, at *6 (E.D. Wis. Dec. 29, 2021) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012)); *see also Manuel,* 966 F.3d at 680.

## IV

## A

Defendants argue they are entitled to summary judgment because they were not deliberately indifferent to Plaintiff's medical needs. Defendants do not dispute that seizures constitute a serious medical condition. Therefore, the Court will focus its analysis on the subjective component of Plaintiff's Eighth Amendment claim.

### 1

Defendant Osmundson argues Plaintiff failed to provide sufficient evidence that he actually knew of and disregarded a substantial risk of harm. Defendant also argues his treatment decisions were well within the standard of care.

After Defendant Kramer prescribed Keppra (500 mg twice a day) on January 11, 2023, Defendant Osmundson saw Plaintiff on February 17 and 22, 2023 to treat a burn and on May 1, 2023 for a medical furlough follow-up visit after Plaintiff's orthopedic appointment. Defendant Osmundson states he has no recollection of Plaintiff raising concerns about Keppra during his appointments in February or May 2023, nor is there any note in Plaintiff's medical records that he complained about his medication. (Doc. 36-1 at ¶¶ 141-142).

On April 26, 2023, Plaintiff asked a nurse if he could keep Keppra on his person. According to Defendant Osmundson, he was not made aware of this request. Defendant Osmundson states he is not informed of a nurse's note unless the patient is referred to him or a nurse brings the note to his attention and makes a note in the medical records that "MD is to review chart." *Id.* at ¶¶ 67-69.

18

Plaintiff self-reported having seizures on May 26, 2023 and June 5, 2023. Plaintiff had a medical furlough appointment with Defendant Osmundson scheduled for June 21, 2023, which Plaintiff chose not to attend. There is no evidence that Defendant Osmundson saw Plaintiff during this time period or knew about his missed dosages of Keppra before July 2023.

On July 31, 2023, a nurse made a note that Dr. Ilyas recommended changing Plaintiff's Keppra dosage to 1000 mg once a day in the evening. The nurse indicated that Plaintiff's chart would be given to the MD to review. The same day, Defendant Osmundson reviewed Plaintiff's chart and modified his Keppra prescription based on Dr. Ilyas's recommendation. According to Defendant Osmundson, the note from Dr. Ilyas on July 31, 2023 was the only note and request he received from Dr. Ilyas or any other mental health provider regarding Plaintiff's Keppra medication. *Id.* at ¶ 106.

According to Defendant Osmundson, due to the half-life of Keppra, it is recommended to take the medication once in the morning and once in the evening. *Id.* at ¶ 103. Defendant Osmundson stated his practice is to follow the manufacturer's guidelines for medication administration. *Id.* However, when another medical provider requests to change a medication, Defendant Osmundson states he will implement the change if the prescription effectively treats the patient's condition and does not cause adverse effects. *Id.* at ¶ 104. There is no evidence that Defendant Osmundson was deliberately indifferent by first following the manufacturer's recommendation for Keppra and then adjusting the dosage based on Dr. Ilyas's recommendation.

Finally, as a physician, Defendant Osmundson was not responsible for and had no control over what housing unit Plaintiff was assigned to or what time medication pass occurred.

Based on the undisputed facts, no reasonable jury could find that Defendant Osmundson was deliberately indifferent to Plaintiff's medical needs. In fact, the record shows frequent and thorough care for Plaintiff's various ailments. Defendant Osmundson is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

2

Defendant Kramer argues she is entitled to summary judgment because she was not aware of a serious risk of harm to Plaintiff.

Defendant Kramer first encountered Plaintiff on January 11, 2023, for a medical furlough follow-up regarding Plaintiff's orthopedic appointment. Defendant Kramer noted Plaintiff appeared alert, oriented, and not in apparent distress. Plaintiff told Defendant Kramer he was concerned that his seizure medication, Dilantin, was causing gum swelling. In response, Defendant Kramer discontinued Dilantin and prescribed 500 mg of Keppra twice daily, which aligned with the manufacturer's recommendation for the medication. (Doc. 36-2 at ¶ 22).

Defendant Kramer next saw Plaintiff on March 8, 2023 for a follow-up appointment regarding his left knee. Defendant Kramer referred him to Dr. Wilson, an orthopedic specialist, for his knee and ankle pain. Plaintiff argues he told Defendant Kramer he was unable to wake up to take his morning dose of Keppra during this appointment; however, there are no notes about any complaints in Plaintiff's medical records. According to Defendant Kramer, she learned Plaintiff often missed his morning dose of Keppra after Plaintiff filed a grievance on August 2, 2023. By this time, Defendant Osmundson had already modified Plaintiff's Keppra prescription on July 31, 2023, and Defendant Shinn had referred Plaintiff to a mental health provider to address concerns regarding Remeron. Even if Plaintiff complained about his Keppra prescription on March 8, 2023, there is no evidence that Defendant Kramer "failed to act despite knowledge

20

of a substantial risk of serious harm to [Plaintiff]." *See Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011). At this point, Plaintiff had not reported any seizures, and the dosage Defendant Kramer prescribed was consistent with the manufacturer's recommendations.

During an appointment on July 17, 2024, Plaintiff told Defendant Kramer he had been experiencing seizures and asked to resume taking Keppra twice a day. Defendant Kramer instructed Plaintiff that he must remain compliant with his medication and attend medline twice a day to take his medication. Defendant Kramer then changed his Keppra prescription back to 500 mg twice a day. Defendant Kramer stated she was comfortable changing Plaintiff's Keppra prescription because it was consistent with the manufacturer's recommendation. (Doc. 36-2 at ¶ 39). The evidence shows that Defendant Kramer responded to Plaintiff's concerns by adjusting the prescription.

Plaintiff did not present any evidence that Defendant Kramer's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [Defendant Kramer] did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoted citation omitted); *see also Pyles*, 771 F.3d at 409 (disagreement between the prisoner and his medical provider "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). Finally, there is also no evidence that Defendant Kramer was authorized to allow Plaintiff to keep his seizure medication on his person, move him to a different housing unit, or change the medication pass time.

Based on the undisputed facts, no reasonable jury would find that Defendant Kramer was deliberately indifferent to Plaintiff's medical needs. Defendant Kramer is entitled to summary judgment.

**3**

Defendant Shinn argues she is entitled to summary judgment because she was not aware of an objectively serious harm to Plaintiff.

Defendant Shinn first encountered Plaintiff on March 1, 2023, when she examined his burn. Defendant Shinn asked Plaintiff if he was taking medications and documented his response that he was taking psych medications. Defendant Shinn next encountered Plaintiff on July 5, 2023, for a medical furlough orthopedic follow-up appointment. No notes were made about any issues with Plaintiff's medication.

According to Plaintiff's medical records, Defendant Shinn and Plaintiff first discussed his morning dose of Keppra on August 1, 2023. By this time, however, Defendant Osmundson had already modified Plaintiff's prescription to 1000 mg once a day on July 31, 2023. On the progress note on August 1, 2023, Defendant Shinn noted that Plaintiff's seizure outcome was good, and his condition was stable.

On August 2, 2023, Defendant Shinn was informed about Plaintiff's grievance regarding his Keppra prescription. Although Defendant Osmundson had already modified the prescription, Defendant Shinn referred Plaintiff to a mental health provider to address concerns about Remeron.

Even if Plaintiff mentioned the issues he had with his morning dose during the March 1, 2023 or July 5, 2023 visits, Defendant Shinn was not deliberately indifferent by failing to take action. *See Arnett*, 658 F.3d at 758. At the March 1, 2023 visit, Plaintiff had not reported any seizure activity or issues regarding his seizures. As of the July 5, 2023 visit, Plaintiff's seizures were not documented or witnessed, nor had he requested sick call visits to address seizure concerns. The fact that Plaintiff did not agree with the manner in which Keppra was prescribed does not rise to a constitutional violation. *See Snipes*, 95 F.3d at 591. No reasonable

jury could find that Defendant Shinn was deliberately indifferent to Plaintiff's medical needs. Defendant Shinn is entitled to summary judgment.

**B**

Defendant Osmundson argues Plaintiff failed to present sufficient evidence that he retaliated against him for filing a grievance. Plaintiff argues he informed Defendant Osmundson that he planned to file a grievance against him, but Plaintiff does not indicate that Defendant Osmundson was actually aware of the grievance after it was filed. (Doc. 43 at pp. 44-45, ¶ 220).

Plaintiff must show that he engaged in activity protected by the First Amendment, suffered a deprivation that would likely deter First Amendment activity, and the protected activity was a motivating factor in Dr. Osmundson's action. *Gomez v. Randle*, 680 F.3d 859, (7th Cir. 2012) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). Although Plaintiff has a First Amendment right to file grievances, Plaintiff did not demonstrate that he suffered a deprivation likely to deter First Amendment activity or that the grievance motivated Defendant Osmundson's actions. *See Gomez*, 680 F.3d at 866 (citing *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010)).

Here, the record shows Defendant Osmundson continued to provide medical treatment after Plaintiff filed a grievance. As previously noted, there is no dispute that Defendant Osmundson modified Plaintiff's Keppra dosage when first contacted by Dr. Ilyas. Further, it is undisputed that Defendant Osmundson evaluated Plaintiff when he was admitted to the infirmary for his only documented seizure at Hill on July 5, 2024.

There is no evidence that Defendant Osmundson was aware of the grievance, nor is there any evidence that the grievance was a motivating factor in the care he provided or that he took any adverse action against Plaintiff. Therefore,

the Court finds Defendant Osmundson is entitled to summary judgment on Plaintiff's First Amendment claim.

V

For the reasons stated, *supra*:

(1)　Defendants' Motion for Summary Judgment [36] is GRANTED. Defendants Kurt Osmundson, Kasey Kramer, and Samantha Shinn are DISMISSED WITH PREJUDICE. Plaintiff takes nothing. Each side is to bear their own attorney's fees, costs, and expenses. The Clerk is directed to close this case and enter judgment.

(2)　Although this case has been dismissed, Plaintiff remains responsible for any remainder of the $350 filing fee. (d/e 5/8/2024).

(3)　If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). To proceed *in forma pauperis* on appeal, Plaintiff must file a motion to proceed on appeal *in forma pauperis* and identify the issues he will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal.

*It is so ordered.*

Entered: February 5, 2026

s/Jonathan E. Hawley<br>U.S. District Judge

24